**426 BLOOMFIELD AVENUE CORP., t/a C & J Towing Service; B & C Towing, Inc.; and Dente Bros. Towing, Inc., Plaintiffs,**

v.

**CITY OF NEWARK, Defendant.**

**Civ. A. No. 95–1974 (MTB).**

United States District Court,
D. New Jersey.

Nov. 2, 1995.

Edmond M. Konin, Mason, Griffin & Pierson, Princeton, NJ, for Plaintiffs.

Kevin P. Malone, Assistant Corporate Counsel, Michelle Hollar–Gregory, Corporate Counsel, City of Newark, Newark, NJ, for defendant City of Newark.

B. Stephen Finkel, Assistant Attorney General, Office of the Attorney General of New Jersey, R.J. Hughes Justice Complex, Trenton, NJ, for petitioner Andrew J. Karpinski, New Jersey Commissioner of Insurance.

## OPINION

BARRY, District Judge.

This matter has come before the court on plaintiffs' motion and defendant's cross-motion for summary judgment pursuant to Fed. R.Civ.P. 56(c). For the reasons set forth below, plaintiffs' motion will be denied and defendant's cross-motion will be granted as to Count One of plaintiffs' complaint. Also for the reasons set forth below, this court will abstain from ruling with respect to the remainder of plaintiffs' claims, and those claims will be dismissed.

## I. STATEMENT OF THE CASE

As a municipal corporation, the City of Newark ("the City") is authorized by the State of New Jersey to provide towing and storage services necessary and appropriate to the performance of municipal functions by contracting for such services with private towing and storage companies. Traditionally, the City had secured its towing and storage services through a system of public bidding. Towing contracts were awarded to the successful bidders in each of the four towing districts within the City limits.[1] In return for being awarded a towing contract, the recipient was obligated to make certain payments to the City. Between 1991 and January 1995, however, the City awarded no towing contracts and, instead, entered into a series of "emergency arrangements" with towers, including plaintiffs, for the provision of towing services.

On January 4, 1995, the Newark City Council adopted Ordinance No. 6S & FA010495 ("the Ordinance"). The Ordinance eliminated the bidding system, and established a new rotational system for the provision of the City's towing and storage needs.[2] The Ordinance mandates the licensing of participating towers, and imposes minimum personnel, equipment and insurance requirements. In addition, it sets maximum fees which participating towers may charge for services including towing, winching, mileage, storage, and cancellation. The Ordinance regulates only non-consensual towing activity—that is, the towing of privately owned vehicles (typically damaged, illegally parked, or found stolen and abandoned) performed at the request of the City and eventually paid for by the owner of the vehicle.[3] Towers found in violation of the Ordinance are subject to a $1,000 fine and the revocation of their "Official Tower's" license.

On January 1, 1995, the Federal Aviation Administration Authorization Act ("the Act") of 1994 became effective, and was codified at 49 U.S.C. § 11501(h) as part of the Interstate Commerce Act. The Act provides that,

> a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... or any motor private carrier with respect to the transportation of property.

49 U.S.C. § 11501(h)(1).

Plaintiffs are three towing companies that regularly have provided non-consensual towing services for the City. They bring this action to enjoin enforcement of the Ordinance, and for a declaration of its illegality. Specifically, plaintiffs contend, in Count One

---

1. In 1991, the districts were re-drawn, and a fifth towing district was added.

2. A non-exclusionary, non-discriminatory rotational system for the provision of municipal towing and storage services is expressly authorized by N.J.S.A. 40A:11–5(1)(u).

3. Although the Ordinance does not expressly apply to the towing of illegally parked vehicles, the State of New Jersey's *amicus* brief suggests that it would. In any event, the Ordinance regulates situations in which the vehicle owner has no choice as to who will tow the vehicle and is afforded no opportunity to negotiate the price of the services provided.

of their complaint, that the Ordinance is preempted by the federal Act. In Count Two, plaintiffs claim that the Ordinance is unfairly excessive in the requirements imposed on towers, is excessively burdensome on the public interest, is vague and overbroad, is arbitrary and capricious, and is unrelated to a legitimate government interest. In Count Three, plaintiffs allege that the Ordinance was adopted for the unlawful purpose of retaliating against plaintiffs for their refusal to pay allegedly unlawful fees imposed upon them by the City under the old bidding system.[4]

In response to Count One, the City alleges that the Act does not apply to municipal nonconsensual towing operations and, thus, does not preempt the Ordinance.[5] In answering Counts Two and Three of plaintiffs' complaint, the City contends that the Ordinance was adopted as a rational response to endemic abuses under the prior bidding system including the overcharging of customers and the towers' refusal to honor the lawful terms of their municipal contracts. All parties have stipulated that no material facts are in dispute and have moved for summary judgment.

## II. *JURISDICTION AND STANDING*

This court has jurisdiction under 28 U.S.C. § 1331. "A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines,*

*Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) (exercising jurisdiction over plaintiff's claims for both injunctive and declaratory relief).

 In order to have standing to sue, plaintiffs must show the existence of injury-in-fact that is caused by the defendant's actions, and that is redressable by this court. *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639 (3d Cir.1995) (quoting standard enunciated in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992)). Because the Ordinance currently is in effect, plaintiffs are suffering injury-in-fact by being compelled under the Ordinance to charge lower prices than they allege they are entitled to charge under the federal Act. In addition, plaintiffs meet the redressability requirement in that plaintiffs' injury obviously would be redressed by a favorable decision. Plaintiffs have standing to sue.

## III. *DISCUSSION*

Because this case deals with express, rather than implied, federal preemption, the only issue for consideration is whether the Act prohibits the type of towing regulated by the Ordinance. The scope of the Act's preemptive force is strikingly broad. Subject to limited exceptions, the Act is a blanket prohibition on state and local regulation of trucking prices, routes, and services. If the Act reaches municipal non-consensual towing, then, it necessarily would conflict with and preempt the Ordinance, at least with respect to the service and rate schedules contained in sections 3 and 10 of the Ordinance.

---

**4.** Although plaintiffs have not labeled Counts Two and Three, the language used is largely that of a substantive due process claim. Unverified minutes from a Newark City Council meeting suggest that plaintiffs' refusal to pay the City for the receipt of various towing contracts was at least one factor in the City's decision to adopt the Ordinance. Plaintiffs claim that the required payments were illegal, that their refusal to pay them was justified, and that the retaliatory motive behind the City's adoption of the Ordinance was, thus, unlawful. The question of the legality of the payments required under the old bidding system is the subject of a suit currently pending in state court between these same parties. *See City of Newark v. Dente Bros. Towing, Inc., et al.,* Docket No. L–11305–93. Because that question

represents a novel issue of state law that could be determinative of plaintiffs' substantive due process claims, it is the prudent course for this court to abstain from considering Counts Two and Three of plaintiffs' complaint.

Plaintiffs' claim that the Ordinance is vague and overbroad (part of Count Two) is patently absurd given the comprehensive regulatory scheme laid out in the Ordinance's fifteen pages of detail. Likewise, plaintiffs provide insufficient elaboration on their claims that the Ordinance is excessively burdensome on both towers and the police department.

**5.** The State of New Jersey has filed briefs and an appendix as *amicus curiae* on behalf of the City.

**368**

### A. *The Federal Act*

 "[T]he question whether a certain state action is pre-empted by federal law is one of congressional intent. The purpose of Congress is the ultimate touchstone." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137–38, 111 S.Ct. 478, 481–82, 112 L.Ed.2d 474 (1990) (internal quotation marks omitted). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Id.* at 138. Thus, this court initially must reject plaintiffs' suggestion that the terms of the specific subsection at issue in this case must be interpreted literally, and without reference to the entire statute. "In so concluding, we do nothing more, of course, than follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991). *See also Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2435, 41 L.Ed.2d 374 (1974) (stating that a court must consider "the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature").

Accordingly, to understand the scope of the Federal Aviation Administration Authorization Act of 1994 (enacted as subsection (h) to 49 U.S.C. § 11501), one must read it in the context of the entire Interstate Commerce Act, of which it is a part. Unfortunately, the Interstate Commerce Act consists of a complex web of exceptions, exemptions and cross-references which must be parsed through both individually and collectively.

On August 23, 1994, President Clinton signed the Act into law, and it became effective on January 1, 1995. Wholly apart from the facial limits of its title, which give this court some pause, the Act amended 49 U.S.C. § 11501 (encaptioned "Interstate Commerce Commission authority over *intra* state transportation" (emphasis added)) to include a new subsection (h) entitled "Preemption of State economic regulation of motor carriers." That subsection, the crux of this case, deregulates certain intrastate trucking activity by providing, in part, that,

> (1) General rule.—Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force or effect of law related to a price, route, or service of any *motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4) of this title) or any motor private carrier with respect to the transportation of property.

49 U.S.C. § 11501(h)(1). The Act goes on in subsections (2) and (3) to exempt the "safety regulatory authority of a State with respect to motor vehicles," state regulations with regard to the size, weight and insurance coverage of vehicles, the transportation of household goods, and regulations regarding uniform cargo liability, bills of lading, cargo credit, and antitrust immunity. 49 U.S.C. § 11501(h)(2), (3).

Thus, if the terms "motor carrier" or "motor private carrier" include tow trucks, then subdivision (h)(1) of the Act would seem to preempt the Newark Ordinance. In the general definitions section of the Interstate Commerce Act, a "motor carrier" is defined as "a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons, ... designed to meet the distinct needs of each such person." 49 U.S.C. § 10102(16)(B)(ii). A "motor private carrier" is defined as "a person, other than a motor carrier, transporting property by motor vehicle when—(A) the transportation is as provided in section 10521(a)(1) and (2) of this title [interstate transportation and public highways]; (B) the person is the owner, lessee, or *bailee* of the property being transported; and (C) the property is being transported for sale, lease, rent or *bailment,* or to further a commercial enterprise." 49 U.S.C. § 10102(17) (emphasis added).

Plaintiffs claim that because towers are bailees travelling on public highways [6], they

---

6. As stated above, to be a motor carrier, a person must meet the requirements of 49 U.S.C.

clearly are motor private carrier and, thus, are within the scope of the Act's preemptive force. Although they do not claim to be "motor carriers" under section 10102(16)(B)(ii), plaintiffs appear to fit that definition as well. While defendant does not explicitly counter this argument, it argues, in more general terms, that local towing is a traditional state activity that is outside the scope of the Act. Presumably, therefore, defendant is arguing, at least in part, that the Ordinance is exempt under the first clause of section 11501(h)(2) which states that the Act "shall not restrict the safety regulatory authority of a State with respect to motor vehicles...." Alternatively, defendant argues that the Act is ambiguous and can be interpreted properly only with reference to the legislative history.

Throughout the Interstate Commerce Act, tow trucks are mentioned only once, at 49 U.S.C. § 10526(b)(3). Section 10526 contains a number of specifically enumerated exemptions to the ICC's general grant of jurisdiction. Section 10526(a) lists fifteen types of motor vehicle transportation that are exempt under all circumstances including, among others, school buses, newspaper delivery vehicles, taxi cabs, most farming vehicles, the transportation of agricultural products, wood chips, crushed or powdered glass, and cooked or uncooked fish. Section 10526(b) provides that,

> except to the extent that the Commission finds it necessary to exercise jurisdiction to carry out the transportation policy of section 10101 of this title, the Commission does not have jurisdiction under this subchapter over—(1) transportation provided

entirely within a municipality, ... or (3) the emergency towing of an accidentally wrecked or disabled motor vehicle.

The interpretation of this provision is particularly troublesome. At first blush, Congress appears to have exempted the towing activity regulated by the Newark Ordinance from the scope of the federal Act's express preemption.[7] Plaintiffs argue, however, that the exemption from jurisdiction is limited by the phrase "under this subchapter...." "This subchapter" applies to interstate transportation. The provision at issue in this case (section 11501(h)) is part of a different subchapter applicable to intrastate transportation. While such a reading may be faithful to the text of subdivision (h), it requires this court to ignore the statutory context into which Congress enacted the provision at issue. As a result, plaintiffs' proffered interpretation would lead to the absurd inconsistency that states and municipalities would retain exclusive jurisdiction over section 10526 activities in *inter*state commerce while the ICC would have exclusive jurisdiction over the same activities (including fashioning local school bus routes and schedules) in *intra*state commerce.

Alternatively, plaintiffs could argue, but do not, that section 11501(h) overrides the conditional towing exemption in section 10526(b)(3) if it is found to represent a Congressional determination that broad intrastate preemption was "necessary ... to carry out the transportation policy of section 10101." *See* 49 U.S.C. § 10526(b). The broad policies enumerated in section 10101 include,

> On the other hand, any other reading would limit the reach of section 11501(h) to *inter*state motor private carriers thereby frustrating Congress' intent to deregulate *intra*state motor private carrier activity.

§ 10521(a). Plaintiffs' assertion that travelling on a public highway is sufficient to bring them within the ICC's jurisdiction under section 10521(a)(2) warrants closer inspection. Subsection (1) grants the ICC jurisdiction over what would be considered traditional interstate and international transportation. Subsection (2) grants the ICC jurisdiction over transportation "in a reservation under the exclusive jurisdiction of the United States or on a public highway." Plaintiffs read "or on a public highway" to be independent of the first phrase of subsection (2). While plaintiffs' reading is the only one that appears to make sense, it seems odd that Congress would bury the most sweeping jurisdictional grant of the entire Act with so little fanfare.

7. Subsection (1), the exemption for transportation wholly within a municipality or contiguous municipalities, may be inapplicable on the facts of this case. As counsel for the City conceded at oral argument, the Ordinance authorizes the City to contract with towers located outside Newark. That, plaintiffs allege, will result in cars being picked up in Newark and towed to and stored in locations outside the City.

to (A) encourage fair competition, and reasonable rates; (B) promote Federal regulatory efficiency ...; ... (D) allow a variety of quality and price options to meet changing market demands ...; ... (F) enable efficient and well-managed carriers to earn adequate profits [and] attract capital ...; ... (I) improve and maintain a sound, safe, and competitive privately owned motor carrier system....

49 U.S.C. § 10101(a)(2). The Act at issue in this case could be consistent with any number of these policies. Notably, however, subsections (C) and (D) clearly indicate that in regulating transportation, the Act seeks to "meet the needs of shippers, receivers, passengers and consumers" and "the requirements of the shippers and traveling public." If these are the persons which Congress intended the Act to serve, there is no place in which towers and their unwitting clients fit.

In the face of this linguistic morass, plaintiffs argue that "it is difficult to understand how the federal statute could be more clear on its face." (Pls.' Br. in Opp. to Br. submitted by *amicus* at 3.) Thus, plaintiffs contend that the Act, on its face, preempts the local towing Ordinance at issue here and that reference to the legislative history is improper.[8] Theoretically, plaintiffs are correct in that "[w]hen interpreting a statute, we look first to its plain meaning, and if the language is unambiguous no further inquiry is necessary." *Licata v. United States Postal Service*, 33 F.3d 259, 261 (3d Cir.1994). In the context of the case at bar, however, it is far from certain that the Act is as unambiguous as plaintiffs find it to be. Accordingly, defendant argues, with obvious force, that when read in the context of the entire statute, the Act is ambiguous, and that "[w]here the words of a statute are ambiguous, as they are here, resort may be made to the legislative history in an attempt to ascertain the intent of the legislature." (Br. of *amicus* at 15) (quoting *Educational Testing Services v. Katzman*, 670 F.Supp. 1237, 1239 (D.N.J. 1987)). As is often the case, however, the Act's legislative history is almost as nebulous as the Act itself.

## B. *The Legislative History*

■ In determining the scope of the Act and the parameters of the terms "motor carrier" and "motor private carrier," it is "entirely appropriate to consult all public materials, including the background of [the Act] and the legislative history of its adoption, to verify that what seems ... an unthinkable disposition ... was indeed unthought of, and thus to justify a departure from the ordinary meaning of the word[s]...." *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1993, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring). Unfortunately, the legislative history to the federal Act at issue in this case does not expressly delineate the scope of the Act's preemptive force. It does so indirectly, however, by clarifying the purpose of the Act and the intent of Congress.

The Act was passed primarily as a legislative response to the Ninth Circuit's ruling in *Federal Express Corp. v. California Public Util. Comm'n.*, 936 F.2d 1075 (9th Cir.1991), *cert. denied*, 504 U.S. 979, 112 S.Ct. 2956, 119 L.Ed.2d 578 (1992). There, the court held that Federal Express was an air carrier within the meaning of the Airline Deregulation Act of 1978. As such, all of Federal Express's shipping activities—in the air as well as on the ground—were thereby immunized from California's intrastate economic regulations. Other shippers, like UPS, that did not do a certain amount of air shipping were determined not to be deregulated. Thus, deregulated shippers enjoyed a substantial competitive advantage over shippers that performed the identical services but remained subject to state and local regulation. As this regulatory inequity continued, the balance struck by our federalist system of commercial regulation was destabilized. In the end, it became considerably less expensive to ship an item vast distances across state lines than it cost to ship the identical item a much shorter distance intrastate.

In response, Congress passed the Federal Aviation Authority Authorization Act of 1994.

---

8. If this court were to hold that the Act does preempt the Newark Ordinance, it would implicitly be determining that the New Jersey statute which sets maximum towing fees and authorizes rotational systems would likewise be preempted. N.J.S.A. 40A:11–5.

According to the House Conference Report, it was the intent of Congress "to create a completely level playing field between air carriers and carriers affiliated with a direct air carrier ... on the one hand and motor carriers on the other." House Conf.Rep. No. 103–677 at 1756. Further, the Report stated that,

> it is clear that all air carriers, ... motor carriers, and motor private carriers involved in the transportation of property are covered by the preemption. The conferees believed it was patently unfair to create a level playing field for most of the industry, while leaving an unfortunate few still bound by economic regulatory controls.

*Id.* at 1760. Urging the adoption of the Report, Congressman Perti stated,

> I want to emphasize that *all* motor carriers are exempted from State economic regulation.... So one of our major purposes in crafting the language included in this conference report was to be sure that all carriers were treated equally *and that no type or class of carrier had a competitive advantage over another.*

Cong.Rec. H7119 (daily ed. Aug. 8, 1994) (emphasis added).

The excerpts quoted above highlight the ambiguity that fills much of the legislative debates. Plaintiffs point to statements in the House Report and various speeches which stress that *all* motor carriers would be exempt from state regulation. According to plaintiffs, all means all, and includes tow trucks by definition.[9] Conversely, defendant draws the court's attention to the fact that the purpose of the Act was to level the *competitive* playing field among shippers and truckers. Thus, because towing companies in no way compete with air shippers or ground truckers in the transportation of property, they clearly lie outside the scope of the Act.[10]

Plaintiffs contend that, if defendant is correct about the purpose of the statute, this court would be faced with a rather difficult theoretical issue of statutory interpretation. If, by its words, Congress cast its net wider than it intended, should the court give effect to the text as cast, leaving it incumbent upon Congress to amend the statute, or does the court have a responsibility to hem the net back to where Congress intended it to fall? Plaintiffs advocate that judicial restraint dictates the former. That argument, however, is premised on the assumption that Congress did, in fact, define "motor carriers" and "motor private carriers" too broadly. In turn, that assumption is preconditioned on a literal reading of subsection (h), made without reference to the interpretive guideposts provided by the statutory context.

■ This court, however, must follow the Supreme Court's directive that the intent of Congress governs questions of express preemption and that courts must interpret statutory language in the context of both the entire statute and relevant legislative history. Reading the Act in the context of the Interstate Commerce Act (specifically 49 U.S.C. §§ 10101(a)(2) and 10526(a) and (b), discussed above) and the congressional intent expressed in the legislative history, this court is convinced that Congress did not define the terms of the Act broader than necessary to effectuate its clearly expressed purpose of leveling the competitive playing field among inter-modal shippers and truckers. Thus defined, no amount of judicial restraint can yield a definition of "motor carrier" or "motor private carrier" that would include tow trucks.

Finally, both parties find support in a corrective amendment offered by Congressman

---

**9.** This certainly would be consistent with the extremely broad definitions of "motor carrier" and "motor private carrier" contained at 49 U.S.C. § 10102(14)–(17), at least when read in isolation.

**10.** Similarly, defendant also quotes language from the Conference Report to the effect that, at least in Congress's view, New Jersey is one of nine jurisdictions which does not regulate intra-state prices, routes and services of motor carriers. From this, defendant argues that, given New Jersey's pre-existing regulatory scheme related to towing, Congress must not have intended towers to be motor carriers under the Act. Of course, this assumes that Congress possessed perfect knowledge of the corpus of New Jersey statutory law. That is an assumption that this court is unwilling to make.

Rahall. After the Act was passed, but before it became effective, Congressman Rahall suggested that Congress make a "technical correction" seeing that "[w]e now find that the act would also affect the ability of a State to regulate tow trucks in those States which engage in such regulation. This clearly was not our intention." Cong.Rec. H10351 (daily ed. Sept. 29, 1994). Curiously, in reserving his objection, Congressman Shuster responded that if the towing exemption passed, it should only be for two years and that after two years, tow trucks would fall within the Act's deregulation provisions. *Id.* Congressman Rahall agreed. *Id.* Both houses of Congress appear to have adopted some form of the technical amendment. A single version of it never passed both houses, though, and the Act became effective as originally passed.

Plaintiffs argue that the colloquy reveals that Congress was explicitly made aware it had deregulated tow trucks and did not, or could not as a matter of political capital, take the necessary steps to officially amend the Act. Defendant contends that because the amendment was presented as a technical correction, it evidences Congress's original intent *not* to deregulate the towing industry. Further, because it addressed a mere technicality, the amendment may have failed to pass simply because most members of Congress found it to be superfluous. The fact that both houses independently passed different versions of the corrective amendment seems to support defendant's position. Nevertheless, the law is what is passed by two houses of Congress and signed by the President—not what is debated, and even approved, but ultimately left on the editing room floor.[11]

### C. *Relevant Caselaw and Administrative Interpretations*

The parties have presented only one administrative interpretation of the Act, in the form of an unverified statement from the United States Department of Transportation. The interpretation suffers from three infirmi-

ties. First, as the document is wholly unverified, it could be anything from an official policy statement to a draft of an internal memorandum. Second, defendant, who submitted the document, has not specified whether the Department of Transportation is in any way officially charged with interpreting or implementing the Act. Most importantly, in the document itself, the Department's position, if a position it be, waffles on both sides of the issue before this court. The document states that,

> State or local towing contracts may of course contain specifics on services, routing, and prices. However, if such contracts have the practical effect of restricting entry into the marketplace or limiting operations, based on demonstrations of public convenience and necessity or other considerations not grounded in legitimate safety or insurance regulation, they will likely run afoul of the new law.... scrutiny will be given to whether the State or locality has acted as a customer in such arrangements, or effectively as a regulator. ... [W]e believe that State or local regulations governing the towing of damaged or abandoned vehicles that are public safety hazards would fall within th[e] exemption [from the Act's preemptive force], assuming again that such regulations are not a guise for broader economic restrictions.

Understandably, all parties contend that the Department's "position" supports their claims. This court, however, is not convinced.

Five unpublished opinions constitute the entirety of the nascent body of caselaw discussing the application of the Act to the towing industry. The five include two state court opinions which reach opposite conclusions and three federal district court opinions which, likewise, reach conflicting results. Most are lacking in, if not completely devoid of, thorough analysis.

In *Towing and Recovery Professionals v. City of Baton Rouge*, No. 413,660 (Parish of East Baton Rouge, March 1995), the local ordinance was very similar to the one at

---

**11.** Both parties agree that this type of post-enactment legislative "history" ranks low in the hier- archy of interpretive authority.

issue here. Focusing on the language of section 11501(h), the court found that because the U.S. Department of Transportation, the ICC, and the State of Louisiana all considered tow trucks to be motor carriers, the federal Act preempted all state and local towing regulations. In so holding, however, the court added that,

> [t]his court is aware how ludicrous this decision may seem. The FAA Act in question was obviously not intended to regulate the activity of intrastate tow trucks. However, there is no circumventing the plain language of the FAA Act. It is the responsibility of the Congress to use words in such a way as to accomplish the ends it seeks.

*Id.* at 1–2.

Reaching the opposite result, the Superior Court of New Jersey agreed with the state Insurance Commissioner that the federal Act did not preempt New Jersey's state towing regulations. *Prosser v. Helmrich Transp.,* No. CAM–L–12648–91 (Super.Ct. of N.J., Trans. of April 28, 1995). In the court's oral opinion, the court offered and relied on its own unsupported assertion that deregulating non-consensual towing was neither the purpose nor the intent of the FAAA provision. *Id.* at 19.

On the federal level, in *Giddens v. City of Shreveport,* Civ. No. 95–315 (slip. op.) (W.D.La. Mar. 10, 1995), Magistrate Judge Payne held that the federal Act did not preempt a local towing ordinance similar to that at issue here. There, the court summarily dismissed arguments based on the proposed Rahall Amendment as being inconclusive and irrelevant. *Id.* at 28. Instead, the court based its decision almost entirely on the fact that section 10526(b) of the Interstate Commerce Act exempts emergency towing operations from ICC interstate jurisdiction. As such, the court found it "neither likely nor logical that Congress, in enacting § 11501(e) [applicable to motor carrier transportation of passengers] intended to preempt local regulation of areas otherwise excluded from the ICC's jurisdiction. To do so would leave the towing industry unlike any other portion of the transportation industry, free from any regulation by federal, state, or local government." *Id.* at 28. The court's policy consideration is certainly compelling.

The court's legal analysis, however, is somewhat less persuasive as applied to the case at bar as section 11501(h), as opposed to section 11501(e), is at issue here. The court's holding does, however, suggest two critical points of statutory construction. First, it suggests that the interstate exemptions contained in section 10526 are applicable to the intrastate preemption of section 11501. Thus, it supports this court's conclusion that section 11501 cannot be read independently of the rest of the Interstate Commerce Act. Second, the court's reasoning suggests the intuitive argument that *intra*state preemption would be unnecessary to level the playing field in those areas such as towing and school bus transportation that were exempted under section 10526 from the ICC's *inter*state regulations to begin with. Because Congress sought a level playing field, those industries that are exempt from federal regulation under section 10526 should likewise be exempt from intrastate deregulation under section 11501.

Largely for the reasons expressed by the *Giddens* court, the court in *Garden State Towman's Assoc. v. Karpinski,* Civ. No. 95–2984 (slip op.) (Oct. 25, 1995), recently found that the federal Act did not preempt the New Jersey Towing and Storage Fee Schedules, codified at N.J.A.C. § 11.3–38.1. Finally, in the only other federal court decision offered by the parties, the court preliminarily enjoined enforcement of local towing regulations, but provided no reasons or analysis, and did not even mention preemption or any federal law. *Tocher v. City of Santa Ana,* Civ. No. 95–224 (C.D.Cal. July 25, 1995). It is entirely unclear why *amicus* provided the case to this court.

### D. *Policy*

Unfortunately, the parties' briefs are almost entirely bereft of policy arguments. In a case that is this close, however, policy arguments certainly should be considered. Most importantly, plaintiffs fail to address the concern of the *Giddens* and *Garden State* courts regarding a towing industry that, if the court were to rule in plaintiffs' favor,

would be entirely unregulated. Because the towing at issue is non-consensual, market forces are not at play to ensure the reasonableness of prices charged to consumers. In the absence of both market and government controls, then, a tower could remove a damaged or illegally parked car and charge its owner limitless and extortionate fees before releasing the vehicle. As one court observed,

> [i]t is unfair to the public ... to permit towers to impose various rates where motorists by and large have little or no freedom of choice and where the most important and overriding concern to the police and to the motoring public is the prompt removal and storage of the disabled vehicles at reasonable rates. The scene of an accident is properly a controlled situation and is no place for bargaining as to rates of charge. Clearly, the motoring public is at a disadvantage in such circumstances and it is then that the unscrupulous take unfair advantage.

*Richard's Service Station, Inc. v. Town of Huntington,* 79 Misc.2d 834, 361 N.Y.S.2d 497 (N.Y.Sup.Ct.1974), *modified on other grounds,* 47 A.D.2d 963, 367 N.Y.S.2d 296 (N.Y.App.Div.1975).

At oral argument, plaintiffs answered this concern by asserting that it is now Congress' responsibility to issue towing regulations. Given the public's vulnerability to corruption and extortion in the context of non-consensual towing, however, it would be grossly irresponsible for Congress to have preempted all state and local regulation before adopting its own federal consumer protection scheme which, of course, it has not done. Plaintiffs have offered no compelling reason why this court should assume that Congress intended such an unfathomable legislative design.

In addition, this case must be approached against the backdrop of alleged monopoly protection and government bribery in the awarding of municipal contracts in Newark's towing industry. *See* Tim O'Brien, "Newark Trial To Shine Light Under Dome," 139 N.J.L.J. 7 (Feb. 13, 1995). Here, defendant has a compelling argument that, like similar ordinances nationwide, the Newark Ordinance represents a local response to the towing industry's allegedly corrupt history. The responsibility for such corrective measures should be left to the State and municipal governments which are in the best position to address the nuances of their own locality's regulatory needs.

Conversely, it could be argued that corruption in the nation's City Halls is exactly why Congress was wise to take the responsibility for regulating the towing industry away from local authorities. Upon examination, however, this argument collapses, as even after deregulation, municipalities would still need a system for assigning non-consensual towing jobs. Whatever system a locality chose would be as susceptible to graft and official corruption after deregulation as it would have been absent federal preemption.

## IV. *CONCLUSION*

The court returns, then, to where essentially it began—the "ultimate touchstone" of congressional intent. Even if the explicit statutory language of the new subsection (h) of section 11501, when read in isolation, includes municipal non-consensual towing, the structure and purpose of section 11501 itself make it quite clear that that cannot be what Congress intended. Accordingly, for the reasons stated above, plaintiffs' motion for summary judgment will be denied and defendant's cross-motion for summary judgment will be granted as to Count One of plaintiffs' complaint. Counts Two and Three of plaintiffs' complaint will be dismissed. An appropriate order will issue.

### *ORDER*

This matter having come before the court on plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56(c); and for the reasons expressed in this court's opinion of even date,

IT IS on this 2nd day of November, 1995 hereby

ORDERED that plaintiffs' motion for summary judgment be and is denied; and it is further

ORDERED that defendant's cross-motion for summary judgment be and is granted with respect to Count One of plaintiffs' complaint; and it is further

ORDERED that Counts Two and Three of plaintiffs' complaint be and are dismissed.