## GREYHOUND LINES, INC.

### v.

**The CITY OF NEW ORLEANS, THROUGH THE DEPARTMENT OF PUBLIC UTILITIES.**

Civil Action No. 98–3352.

United States District Court,
E.D. Louisiana.

Dec. 3, 1998.

(7th Cir.1996).

Geoffrey J. Orr, Frederick Robert Campbell, Campbell, McCranie, Sistrunk, Anzelmo & Hardy, Metairie, LA, for Joey Bennett, Todd E. King, Larry Green, Reginald Goins, George Bastin, Edwin Traufant, Jr., Harold Nash, Greyhound Lines, Inc.

## ORDER AND REASONS

FELDMAN, District Judge.

Before the Court is plaintiff Greyhound Lines, Inc.'s request for a preliminary and permanent injunction against the City of New Orleans to restrain enforcement of two City Code provisions requiring bus drivers to obtain a "certificate of public necessity and convenience" before operating in the City. For the following reasons, the injunction is GRANTED.

### Background

Greyhound Lines, Inc., seeks an injunction against the City of New Orleans to restrain enforcement of two sections of the City Code, 162–81, 162–151,[1] requiring bus operators to obtain a "certificate of public necessity and convenience" before operating on City streets. Pursuant to the Code, the City requires bus drivers to pay a fee to obtain a permit for the operation of buses within the City.

Greyhound maintains a national fleet of passenger buses that operate on interstate and intrastate routes. It does not have any locally registered or housed buses in New Orleans, it simply uses Union Station when needed. All its buses are registered with the Department of Transportation, bearing ICC registration numerals on each bus.[2] Greyhound has not obtained the permits required by the City and the City Code.

In September of this year, several Greyhound drivers were operating buses that had been chartered to pick up and transport passengers from their hotels to the Convention Center in New Orleans. The charter was with the "Convention Store's" clients. While delivering their passengers at the Convention Center, all drivers were cited for violating the City Code.[3] The drivers have been arrested in some cases, and the City intends to continually enforce the Code provisions.

Trials have been scheduled in the local Municipal Court for each driver. Plaintiffs have filed a motion to quash the citations, but a Municipal Court judge refused to entertain a hearing with respect to one driver. Greyhound seeks to restrain enforcement of the Code provisions, claiming that they are preempted by the Transportation Equity Act for the 21st Century, Pub.Law. 105–178, amending 49 U.S.C. § 14501(a). All remaining hearings and trial dates in Municipal Court have been continued until after this Court's ruling on the issuance of a preliminary and permanent injunction.

---

1. The City Code provides:
   162–81:
   It shall be unlawful for any person to drive any vehicle regulated by this chapter without possessing a current driver's permit or duplicate thereof should the same be lost or destroyed.
   162–151:
   No person shall own or operate or permit any other person to operate an animal-drawn vehicle, a for hire vehicle, tour bus or tour vehicle, airport limousine, taxi cab or any other for hire passenger motor vehicle offered for hire and engaged in the business of transporting passengers for hire on the streets of the City not operated on fixed rail, upon specified routes or between fixed terminals without having first applied for and received an appropriate certificate of public necessity and convenience in the manner provided in this article.

2. The Interstate Commerce Commission has been succeeded by the Surface Transportation Board under the ICC Termination Act.

3. There are two citations relating to the same offense for each driver. One provision requires the *driver* to have a permit; the other provision requires the *vehicle* to have a permit.

*Law and Application*

## I. *Injunctive Relief*

Injunctive relief[4] is an appeal to this Court's equity jurisdiction; it triggers the Court's sound discretion. *Meredith v. City of Winterhaven*, 320 U.S. 228, 235, 64 S.Ct. 7, 88 L.Ed. 9 (1943). It is a fundamental teaching of equity that injunctive relief is unavailable when the party seeking relief has an adequate remedy at law and will not suffer irreparable injury if the requested equitable relief is denied. *O'Shea v. Littleton*, 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). This doctrine, however, does not prevent federal courts from enjoining municipal officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." *Morales v. Trans World Airlines*, 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (quoting *Ex parte Young*, 209 U.S. 123, 145–47, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). The threat of continued enforcement actions and repetitive penalties makes alternative remedies at law virtually unavailable for Greyhound. *See id.*[5]

A preliminary injunction may be granted only if four factors are established: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). The standard for a permanent injunction is essentially identical, with the exception that one must prove actual success on the merits. *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The par-

ties have been given notice and opportunity to be heard and to brief this matter, and agreed to proceed to a trial on the merits. Fed.R.Civ.P. 65(a)(2).

Because this case involves preemption, a finding of success on the merits implicitly carries with it a determination that the other three requirements have been satisfied. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir.1990). Indeed, when considering the balance of hardship, enjoining a preempted ordinance would not subject the City to any undue hardship or penalty because the injunction would require only the City's compliance with federal law under the Supremacy Clause. *See Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir.1962) (noting that a permanent injunction requiring compliance with federal law does not constitute a hardship for it only "requires the defendants to do what the Act requires anyway—to comply with the law"). Accordingly, the Court turns to the merits of Greyhound's preemption argument.

## II. *Preemption*

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state law or municipal ordinance that conflicts with federal law is without effect. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) ("[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws.").

The touchstone of the preemption inquiry is Congressional intent; our republican structure instructs that local regulations es-

---

4. The City does not discuss, or oppose, the injunction standards in its opposition brief. Instead, the City limits its arguments to the merits of the preemption issue.

5. Abstention considerations are not implicated here. There are no criminal proceedings pending against Greyhound which might otherwise bar injunctive relief. *See Doran v. Salem Inn,*

*Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 756, 760, 27 L.Ed.2d 669 (1971). The City has not argued for abstention based on the cases pending against the individual drivers. Indeed, the City agreed to continue all matters in Municipal Court pending resolution of this matter in federal court.

tablished under the historic police powers of the States are not to be displaced by federal law "unless that was the clear and manifest purpose of Congress." *Mortier*, 501 U.S. at 605, 111 S.Ct. 2476 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Federal law may preempt state and local laws in three distinct ways: "(1) Congress expressly preempts state law, (2) Congressional intent to preempt is inferred from the existence of a pervasive regulatory scheme, or (3) state law conflicts with federal law or interferes with the achievement of federal objectives." *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 n. 1 (5th Cir.1995).

The parties do not contend that this case involves implied preemption. Thus, the Court focuses on the express preemptive language in the statutory scheme, 49 U.S.C. § 14501. Because the preemption question is informed by legislative intent, the Court begins with "the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Morales*, 504 U.S. at 383, 112 S.Ct. 2031 (quotation omitted). For this Court, words still mean what they say; unartfully used words will be given a meaning that does not do violence to the legislative scheme or public policy.

### A.

Measuring the scope of 49 U.S.C. § 14501(a) requires that it be read in the context of the Interstate Commerce Act of which it is a part. *See Bennett v. Spear*, 520 U.S. 154, ——, 117 S.Ct. 1154, 1166, 137 L.Ed.2d 281 (1997) (noting that provisions

must be read in context of entire statute). Unfortunately, the Act, along with its various amendments is an excellent example of poor legislative draftsmanship, filled with exceptions, exemptions, and cross-references. *See 426 Bloomfield Ave. Corp. v. City of Newark*, 904 F.Supp. 364, 368 (D.N.J.1995).

■ The preemption clause of 49 U.S.C. § 14501(a), enacted as part of the recent TEA–21 amendments, states:

(a) Motor carriers of passengers.—

(1) Limitation on State law.—No State or political subdivision thereof and no interstate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to—***

(C) the authority to provide intrastate or interstate charter bus transportation.

This paragraph shall not apply to intrastate commuter bus operations.

49 U.S.C. § 14501(a)(1)(c). A "motor carrier" is defined as a "person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12). Thus, under the plain and ordinary reading of this provision, federal law expressly preempts local ordinances, such as City Code sections 162–81, 162–151, that relate to intrastate charter bus operations. *Cf. R. Mayer of Atlanta, Inc. v. City of Atlanta*, No. 97–9174, 158 F.3d 538, 1998 WL 740052, at *1 (11th Cir.1998) (holding that another recently added preemption provision, 49 U.S.C. § 14501(c), expressly preempts local regulation relating to consensual towing services).[6]

---

**6.** The City has not challenged Congress' power to enact these regulatory provisions. There is no doubt that the Commerce Clause gives Congress the power to regulate this field of commerce. *See* U.S. Const. art. I, § 8, cl. 3. Leading cases have a broad view of congressional commerce power, *see, e.g., Heart of Atlanta Motel v. U.S.*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Congress need have only a rational reason for finding that a regulated activity affects interstate commerce. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Because Greyhound is transporting interstate travelers, the modest test for commerce power will be satisfied. *See Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir.1976) (hold

ing that carrier engaged in interstate commerce where goods either originated or are destined for points outside of state, "even though the route of the particular carrier is wholly within one state"). The provisions at stake here also are akin to those provisions of the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. §§ 11501, 41713(b)(4), which similarly preempt state regulation of intrastate motor carrier activity. The Tenth Circuit upheld these provisions against a commerce-power attack. *Kelley v. United States*, 69 F.3d 1503 (10th Cir. 1995). Counsel for the City have candidly admitted that *Kelley*, and the deregulation cases of the Eleventh Circuit cannot be distinguished; rather, counsel urge they should not be followed.

There are express limitations to the preemptive sweep of this law, but they cannot save the City ordinances. The statute "does not apply to intrastate commuter bus operations." 49 U.S.C. § 14501. Although the term is not defined in the Act, an ordinary reading of "commuter" suggests regular travel to and from work. In the pre-amendment Transportation Act, "commuter bus operations" was defined as "short-haul regularly scheduled passenger service provided by motor vehicle in metropolitan and suburban areas, whether within or across the geographical boundaries of a State, and utilized primarily by passengers using reduced-fare, multiple-ride, or commutation tickets during morning and evening peak period operations." 49 U.S.C. § 10102(5) (West 1995), amended by Pub.L. 104–88.[7] In another context, commuter bus service has been defined as

> fixed route bus service, characterized by service predominantly in one direction during peak periods, limited stops, use of multi-ride tickets, and routes of extended length, usually between the central business district and outlying suburbs. Commuter bus service may also include other service, characterized by a limited route structure, limited stops, and a coordinated relationship to another mode of transportation.

49 C.F.R. § 37.3 (DOT definition for transportation services for individuals with disabilities under the ADA); *see also* 49 C.F.R. § 374.303 (defining commuter service). Thus, the definition of a commuter operation ought not be stretched to cover Greyhound's service under a limited contract to transport travelers from their hotels to a convention site.

The City also is exempt from section 14501 if it is regulating safety, imposing route controls or limitations on size and weight of vehicles, or if it imposes certain insurance requirements on carriers. 49 U.S.C. § 14501(2). The City, however, does not contend that the Code requirements are anything more than a registration under which drivers have to pay a fee for a special permit.

There is no safety test, no control for the number of permits to be issued, or any size, weight, route, or insurance restrictions.

**B.**

Amplifying the scant legislative history, the City contends that Congress intended to carve out a narrow exception to the "charter" operations preemption, in addition to the express statutory provision allowing States to regulate with respect to safety, route controls, vehicle size and weight, and insurance requirement. *See* 49 U.S.C. § 14501(a)(2). Pointing to the Conference report accompanying the amendment, the City maintains that the preemption provision "does not limit a State's ability to regulate taxicab service or limousine livery service." *See* H.R.Rep. No. 550, 105th Cong.2d Sess. 495–96 (1998), reprinted in 1998 U.S.C.C.A.N. 170. The City is correct, but the argument targets nothing.

**1.**

This argument fails for two reasons. First, the statutory language at issue is unambiguous; it makes no mention of taxicab or livery service. Although the Conference committee expressed a need to exempt taxi and livery services from federal preemption, the statute adopted by Congress does not reflect this concern. To be sure, the Conference also noted that the amendment should allow states to continue regulating with respect to safety, route controls, vehicle size and weight, and insurance requirements. Congress adopted this concern, inserting the provision found at section 14501(a)(2); Congress conspicuously left out any mention of taxicab or livery service. *National Endowment for the Arts v. Finley*, 524 U.S. 569, ——, 118 S.Ct. 2168, 2182, 141 L.Ed.2d 500 (1998) (Scalia, J., concurring) (noting that legislative history has no claim on the Court's attention when Members of Congress did not vote for and adopt such language; this Court agrees that a statute should be reviewed for what it says, not what it may have said). Furthermore, the Senate note leaves no doubt that Congress intended to "strike[ ] the authority of the states to regulate intra-

---

7. The revision notes do not explain why Congress deleted the definition, but the current statutory language is identical to the pre-amended statute. Thus, the Court adopts the previous definition.

state and interstate charter bus transportation." 1998 U.S.C.C.A.N. 170. There is no suggestion that the scope of this preemption should be curtailed for charter service that might somehow qualify as livery service (it does not, on the facts here).

Second, even were the Court to stray beyond the plain statutory text the City's argument still must fail. The City's strained logic cannot transform the square-peg definition of "charter service" into the round-hole understanding of "livery" service. Again, the Court resorts to the ordinary meaning of the words employed in the statute.

Greyhound's operations clearly qualify as charter service. Although the term is not defined, the Department of Transportation has consistently defined the term in a variety of contexts. For example, "charter service" has been defined as:

> transportation using buses or vans, or facilities funded under the Acts of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge (in accordance with the carrier's tariff) for the vehicle or service, have acquired the exclusive use of the vehicle or service to travel together under an itinerary either specified in advance or modified after having left the place of origin.

49 C.F.R. § 604.5(e) (Part 604—Charter Service). The defining character of a charter for transport is the moving of a group, under a contract, at a fixed rate, for the exclusive use of the vehicle, for a specified itinerary. *See* 49 C.F.R. § 390.5 (defining "charter transportation of passengers"); 49 C.F.R. § 374.503 (defining "special or chartered party"); *cf.* 49 C.F.R. § 380.28 (describing charter prospectus requirements); 49 C.F.R. § 373.103 (describing charter service receipt requirements); 14 C.F.R. § 380.2 (defining "charter flights"); 14 C.F.R. pt. 241, § 03 (defining charter air service) Greyhound's services are compatible with this definition.

Livery service, in contrast, contemplates the use of a vehicle "as a means of conveying members of the public, usually for a price, but without discrimination as to the persons within the class of persons so transported, but indiscriminately for any who may call for such service." *Lakeshore Dev. Corp. v. Gulf*

*Ins. Co.,* 353 F.2d 163, 165 (5th Cir.1965); *accord Pender v. United States,* 866 F.Supp. 1129, 1136 (N.D.Ind.1994) (citing cases). Ordinarily payment comes from the individual persons transported, *Lakeshore Dev.,* 353 F.2d at 165, not from the group as a whole under contract, as the case would be with charter service. Charter transportation is not available indiscriminately to any person in the public (as with a taxicab), but rather only to those in the group of persons with a common purpose who have entered a contract with the charter company or benefit from one entered on their behalf. Greyhound does not offer to transport to the Convention Center anyone willing to pay a fare; it transports only those people who are members of the charter group, in this case, clients of The Convention Store. *See St. Paul Mercury Indem. Co. v. Knoph,* 251 Minn. 366, 87 N.W.2d 636, 638 (Minn.1958) (Livery "depends upon whether the transportation is generally available to the public rather than whether any money has been or will be paid. Thus, where the persons transported were limited to members of a club, fellow employees, or fellow show members, the courts uniformly" determine that such service does not qualify as livery.); *Allstate Ins. Co. v. Normandie Club,* 221 Cal.App.2d 103, 107, 34 Cal.Rptr. 280 (Cal.Ct.App.1963) (noting that the "chief factor lies in the policy of selection and exclusion of passenger," not in the fact that money was paid for the service). Thus, Greyhound's services are charter services, as distinct from taxi or livery services, and the plain language of section 14501 preempts state regulation.

### 2.

Implicit in the City's argument is the claim that its ordinances do not "relate to" charter transportation, and thus cannot be preempted. *See* 49 U.S.C. § 14501(a). As the Court has determined that Greyhound was operating a charter service, the certification requirement clearly would relate to charter transportation. In a similar context, the Supreme Court has noted that the "relating to" language of transportation statutes should be accorded its ordinary meaning. *Morales,* 504 U.S. at 383, 112 S.Ct. 2031 (airline regula-

tions). Because Congress' choice of words denotes a broad preemptive purpose, *id.,* thus these municipal regulations "relate to" charter transportation because they affect Greyhound's ability to operate within the City boundaries.

### C.

The City also tries to escape preemption by arguing that section 14501 is inconsistent with 49 U.S.C. § 13506(b), which provides narrow exceptions to the general grant of jurisdiction (not to preemption) to the Department of Transportation and Surface Transportation Board. This argument is more troublesome than the legislative intent argument, but nevertheless cannot save the City. These seemingly conflicting parts of the law can be reconciled.

Section 13506(b) provides:

Exempt unless otherwise necessary.—Except to the extent the Secretary or Board, as applicable, finds it necessary to exercise jurisdiction to carry out the transportation policy of section 13101, neither the Secretary nor the Board has jurisdiction under this part over—

(1) transportation provided entirely in a municipality. . . .

49 U.S.C. § 13506(b)(1) The City suggests that the preemptive scope of section 14501 should be circumscribed to the extent that charter services are offered strictly within the municipal boundaries. The Court cannot agree.

Section 14501 speaks specifically to a particular *type* of transportation (charter services), whereas section 13506 addresses *geography,* exempting DOT and the STB jurisdiction, unless otherwise asserted, when transportation is provided wholly within a municipality. A plain reading of section 14501 does not condition preemption under subsection (c) on the motor carrier being subject to jurisdiction under the Transportation Equity Act. Indeed, unlike subsections (a) and (b) which preempt state regulations with respect to passenger carriers "subject to jurisdiction under subchapter I of chapter 135 of this title, subjection (c) makes no mention of jurisdiction." 49

U.S.C. 14501(a)(1). Thus, the charter transportation provision is not limited by section 13506. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (internal quotation omitted).

Furthermore, section 13506 cannot restrict the power of Congress to preempt state regulation in the present context. Congress unmistakably sought to "strike[ ] the authority of the states to regulate intrastate and interstate charter bus transportation." 1998 U.S.C.C.A.N. 170; compare 49 U.S.C. § 14501(a) (Pub.L.105–178) with former § 14501(a) (Pub.L. 104–88, making no mention of charter services preemption, except with reference to rates) and former 49 U.S.C. § 11501 (recodified as § 14501 by ICC Termination Act, same). Section 14501 is entirely consistent with the Congressional transportation policies to deregulate certain areas of commerce. *See* 49 U.S.C. § 13101. Preempting local charter service regulations may promote "competitive and efficient services" by allowing national carriers like Greyhound to compete with entrenched local carriers. *See* 49 U.S.C. § 13101(a)(2)(A), (F).

Notably, section 13506 also permits the Secretary of Transportation or the STB to exercise jurisdiction to carry out national transportation policy. 49 U.S.C. § 13506(b). Hence, federal agencies can regulate intrastate charterers, even those providing services entirely in a single municipality, (insofar as section 14501 effectuates the transportation policies expressed in section 13101,) if regulation is deemed necessary. *See R. Mayer of Atlanta,* 158 F.3d 538, 1998 WL 740052, at *5 (recognizing that section 13506 does not restrict jurisdiction in aid of transportation policy, and thus does not limit preemption of consensual towing services under section 14501).

The interplay between sections 14501 and 13506 ought not be read to mean that federal regulators must exercise their jurisdiction before Congress can oust state and regulations from the field. Congress unequivocally

chose to deregulate charter services, displacing local regulators, under section 14506; Congress need not do more to divest the City of its jurisdiction.[8]

This construction is compelled when one considers that Congress expressly excepted commuter bus operations from preemption. 49 U.S.C. § 14501(a)(1). The express reference to commuter operations supports the conclusion that Congress intended to preempt those services (charter services) that are not within the exception.[9] *See Harris County Wrecker Owners for Equal Opportunity v. City of Houston*, 943 F.Supp. 711, 722 (N.D.Tex.1996) ("The addition of § 14501(c)(2)(C) [exempting non-consensual towing from preemption] confirms congressional intent in § 14501(c)(1) to preempt state and local [consensual] towing regulations."). Simply stated, current federal law and public policy instruct that bus charter services may not be locally regulated.

### III. *Conclusion*

For the foregoing reasons, plaintiff's request for a preliminary and permanent injunction is GRANTED. A permanent injunction shall issue prohibiting enforcement of New Orleans City Code sections 162–81, 162–151 with respect to Greyhound's charter bus operations.

---

8. In any case, charter operators are not free from federal regulation. They are subject to the panoply of federal safety regulations. *See generally* 49 C.F.R. subchapter B. In addition, they must maintain certain carrier receipts and bills as a charter operator. 49 C.F.R. § 373.103.

9. This different treatment probably reflects the understanding that commuter and charter providers face different market characteristics. On the one hand, interstate providers will enter local charter markets for occasional charters, as Greyhound did—and should be allowed to in order to foster efficiency and competition. Deregulation thus removes entry barriers which interstate providers would otherwise face.

On the other hand, commuter services are uniquely local in character and unlikely to face competition from interstate providers because commuter services tend to require sustained commitments to regular routes to attract customers. It would be rare indeed for a national provider like Greyhound to try to enter the commuter market. Thus, state and municipal regulation of the local commuter market have been left undisturbed by section 14501's preemption provision. (Municipal commuter-service providers which are technically "interstate" carriers would be exempt from federal regulation under section 13506(b), unless federal officials deem it necessary to reign in the field.)