[No. A089493. First Dist., Div. Five. Feb. 1, 2001.]

THE PEOPLE ex rel. LOUISE H. RENNE, as City Attorney, etc., Plaintiff and Respondent, v.
PATRICK SERVANTES, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, parts IV, V and VI of this opinion are not certified for publication.

## COUNSEL

David W. Washington for Defendant and Appellant.

Louise H. Renne, City Attorney, Kimon Manolius, Ellen Forman and Rose-Ellen Heinz, Deputy City Attorneys, for Plaintiff and Respondent.

## OPINION

**RICHMAN, J.**\*—Presiding Justice Harold G. Clarke of the Georgia Supreme Court observed that "[t]he law gives the towing company a great advantage over the owner of the towed car, and creates a great potential for unfair business practices and abuse of the public." (*Porter v. City of Atlanta* (1989) 259 Ga. 526, 528 [384 S.E.2d 631, 634].) While that observation was made 11 years ago and some 3,000 miles away, Justice Clarke was talking about Patrick Servantes (Servantes), who over a period of years committed myriad unfair business practices and abused the public, towing hundreds of cars off private property in abject disregard of applicable California law and San Francisco regulations. Such practices included towing vehicles without a permit, towing vehicles from private property without authorization from the property owners, refusing to accept credit cards as payment for towing and storage charges to allow release of the vehicle, and imposing excessive towing and storage charges.

The City Attorney of San Francisco brought suit to curtail Servantes's practices, alleging a claim for unfair business practices (Bus. & Prof. Code, § 17200 et seq.) and seeking a permanent injunction, civil penalties, and disgorgment of profits. Prior to trial the city attorney obtained a preliminary injunction ordering Servantes to refrain from such conduct.

---

\*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Following a six-day trial at which the city attorney presented 24 witnesses, the trial court found that Servantes had committed hundreds of violations of state and local laws and ordered him to pay a civil penalty of $74,700, representing $100 for each of the 747 illegal tows, and further ordered him to disgorge his illegal profits of $52,500 as restitution to the victims. The court also found that Servantes had violated the preliminary injunction 174 times, for which the court assessed an additional penalty of $87,000, calculated at $500 for each violation. Finally, the court permanently enjoined Servantes from towing vehicles from private property within the State of California and imposed restrictions on consensual towing by Servantes.

Servantes appeals, asserting three arguments, one with two subparts: (1) federal law preempts the laws on which the trial court relied; (2) the judgment and fines (a) violate due process and (b) are not supported by substantial evidence; and (3) the injunction is void. We conclude that none of Servantes's claims has merit, and we affirm the judgment.

## I. The Regulatory Scheme

We begin our analysis with the pertinent regulatory scheme, starting with Vehicle Code section 22658, by which the California Legislature has undertaken to regulate the removal of vehicles from private property by a towing service.[2] That section provides, among other things, that the property owner must first notify the police (Veh. Code, § 22658, subd. (a)) and that the towing company must have written authorization from the property owner or agent, who must be present at the time of the tow (subd. (l)). Section 22658 also provides that the towing company may not impose excessive charges for towing and storage (subd. (i)), and requires that the owner of the storage facility to which the vehicle is towed accept a bank credit card or cash for the towing and storage charges (subd. (k)).[3]

The Legislature has also delegated to local authorities the power to regulate the licensing and operation of towing services and tow truck drivers.

[2]The Legislature has also enacted a statutory scheme regulating the removal of vehicles from streets and highways by police officers. (Veh. Code, § 22650 et seq.) The issues before us in this appeal, however, are confined to towing from private property.

[3]Vehicle Code section 22658 provides a private right of action for the owner of the towed vehicle. A private property owner who causes the removal of a vehicle without complying with statutory requirements is liable to the vehicle owner for double the towing and storage charges (subd. (e)). A towing service which removes a vehicle without written authorization is liable to the vehicle owner for four times the towing and storage charges (subd. (l)(3)). Similarly, anyone who charges excess towing or storage fees is liable to the vehicle owner for four times the amount charged (subd. (j)). And any operator of a storage facility who fails to accept a credit card is liable to the vehicle owner for four times the towing and storage charges not to exceed $500 (subd. (k)).

(Veh. Code, § 21100, subd. (g).)[4] Pursuant to that authority, the City and County of San Francisco (City) has enacted ordinances which require towing companies and tow truck drivers to obtain a permit before removing vehicles from private property. (S.F. Police Code, § 3000.) The permit scheme requires an application to the chief of police, payment of an application fee, and an investigation and hearing. (S.F. Police Code, §§ 3002-3004.) The ordinance requires the towing companies to notify the police tow desk within 30 minutes of every vehicle removed from private property, providing the tow truck driver's name and permit number and identification of the vehicle. (S.F. Police Code, § 3057.) The ordinance further requires the towing companies to maintain records of each towed vehicle and to retain those records for three years. (S.F. Police Code, § 3060.) Another City ordinance requires towing companies removing vehicles from private property to prominently display a copy of their schedule of fees, prohibits charging excess fees, and requires acceptance of credit cards, cash, or checks for release of towed vehicles.[5] (S.F. Traffic Code, §§ 172.03, 172.05, 172.08.)

## II.  SERVANTES'S CONDUCT

Servantes first became involved in towing in 1991 or 1992 and opened his own company, Bayshore Towing (Bayshore), in 1993. On September 14, 1993, Servantes was issued a tow operator permit from the City. Within months, specifically in June 1994, that permit was revoked based on findings that Servantes had illegally removed vehicles from public streets and then reported them as private property tows, illegally demanded payment in cash, and charged excessive amounts to release the vehicles.

In April 1995 Servantes applied for a new permit as a tow operator and owner of Bayshore, but his application was denied based on his prior misconduct. However, Bayshore was subsequently issued a permit when Servantes reported that a new general manager, Allen Lawson, had taken over the company. Later, in 1996, Lawson notified the police permit division that he was no longer associated with Bayshore, and he surrendered his towing permit.

After that development, Servantes and other Bayshore drivers were stopped several times by the police and cited for towing vehicles without a

---

[4]Likewise, the Legislature has delegated to local authorities the power to establish procedures and set costs for the release of vehicles removed by police officers. (Veh. Code, § 22850.5.)

[5]Fees for towing of vehicles from public streets are set by agreement between the City and a contracting towing company. (See S.F. Traffic Code, § 172.04.) Fees for removing vehicles from private property may not exceed those contractual rates. (Veh. Code, § 22658, subd. (i); S.F. Traffic Code, § 172.04.)

permit and for driving without a valid driver's license. Servantes applied for a new permit, and in July 1998 the application was denied on the ground that Servantes had continued to operate his towing business despite his lack of a permit by using false identification. The hearing officer further found that Servantes had refused to accept credit card payments, overcharged for towing and storage, and towed vehicles onto public streets before towing them to his storage facility.

In the meantime, police investigations were undertaken of Servantes and his towing operations based on numerous citizen complaints, which investigation eventually led to the police determination that Servantes was conducting an unlicensed towing operation.[6] As part of the investigation, the police conducted a stakeout operation by placing a car in a private parking lot from which Bayshore had been towing vehicles. Within 15 minutes, when no attendant was at the lot, Servantes picked up the car and towed it to his storage lot.

At trial, the logs from the City's police tow desk dated from January 1, 1996, to June 30, 1999, were introduced and showed that Servantes was continuing to tow vehicles from private property despite the revocation of his permit. During that time Bayshore had conducted 747 tows, 523 of which were reported as having been conducted by Ernesto DeAlba, Martin Sexton, or Allen Lawson, at times when these drivers were not working for Bayshore. As to this, the trial court found that Servantes himself had conducted the tows and had falsely given another driver's name.

During discovery Servantes was asked to produce his business records including the written authorizations for towed vehicles, but he produced almost nothing. The trial court found that the few authorizations that were produced were inadequate in that they were missing vital information, such as the date of the tow, the vehicle license number, or the identity of the Bayshore driver who did the tow. Three police investigators testified at trial that in the course of their investigations they could find no evidence that written authorizations had been given for Bayshore's tows, illustrated, for example, by the fact that the space on the towing receipt form for the signature of the property owner was always left blank.

In addition, there was direct evidence of noncompliance with the law. One parking lot owner testified that he had contracted with Servantes to have Bayshore remove vehicles from his lot, but that many of the tows were unauthorized. Another parking lot owner reported to the police investigators

---

[6]Pursuant to a search warrant, the police seized some miscellaneous papers found in a vehicle on Bayshore's storage lot. The police also seized three of Servantes's five tow trucks.

that she left the towing decisions to Servantes. Three vehicle owners who had returned to the parking lots just as their cars were being hooked up to the Bayshore tow truck testified that no agent of the lot owner was present at the time. Two vehicle owners testified that they contacted the lot owner after their cars were towed, and the lot owner's agent was surprised the car had been towed.

The trial court further found that in all 747 cases Servantes had insisted on cash payment from the vehicle owners, refusing to accept credit cards or personal checks. Luis Jacques, a driver for Bayshore, gave testimony that Bayshore accepted only cash. None of the towing receipts produced by Servantes indicated payment by credit card. During the police investigation, questionnaires were sent to all owners of vehicles towed by Bayshore, and all who responded reported that Bayshore accepted only cash. Although Servantes testified he did accept credit cards, he also testified that he kept no receipts of credit card transactions. Servantes's credit card account statements showed virtually no activity from 1996 to 1999, and the little activity reflected was for an average charge in an amount less than the charge for a private property tow. Eleven victims testified at trial that they were told by Bayshore representatives that they had to pay in cash in order to retrieve their vehicles.

## III. FEDERAL PREEMPTION

■ An unlawful business practice within the meaning of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) is one that is forbidden by law, whether civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 531-532 [63 Cal.Rptr.2d 118]; *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838-839 [33 Cal.Rptr.2d 438].) A defense to the underlying offense is a defense under California's unfair competition law. (*People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654, 673 [80 Cal.Rptr.2d 419].)

■ Here, Servantes did not dispute that he operated without a towing permit. His principal defense at trial was that the state and local regulations governing towing operations are preempted by federal law and were thus unenforceable. The trial court rejected the argument, and Servantes reiterates his argument on appeal. We review the issue de novo as an issue of law. (*Southern Cal. Gas Co. v. Occupational Safety & Health Appeals Bd.* (1997) 58 Cal.App.4th 200, 204 [67 Cal.Rptr.2d 892].)

Congress enacted the Federal Aviation Administration Authorization Act of 1994 (FAAA Act), which expressly preempts state or local regulation "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." (49 U.S.C. § 14501(c)(1).)[7] This preemption of state and local regulation had two apparent purposes: first, to provide across-the-board deregulation and eliminate nonuniform state regulations of motor carriers that were interfering with interstate commerce; and second, to eliminate the advantage that had been enjoyed by air carriers, such as Federal Express, over the more heavily regulated ground-based shipping competitors. (*Californians for Safe Dump Truck Transp. v. Mendonca* (9th Cir. 1998) 152 F.3d 1184, 1187].)

There seems little question that a towing company qualifies as a "motor carrier," which is broadly defined as "a person providing motor vehicle transportation for compensation." (§ 13102(12).) Indeed, Congress's intent to include towing companies within the preemption clause is revealed in section 14501(c)(2)(C), which provides a limited exception to allow state and local regulation of the price of nonconsensual towing services.[8] There would have been no need for Congress to include this exception if Congress had not intended to preempt state and local regulation of towing services generally. (*R. Mayer of Atlanta, Inc. v. City of Atlanta* (11th Cir. 1998) 158 F.3d 538, 543 (*Mayer*); see also *Ace Auto Body & Towing, Ltd. v. City of New York* (2d Cir. 1999) 171 F.3d 765, 771 (*Ace*); *Hott v. City of San Jose* (N.D.Cal. 2000) 92 F.Supp.2d 996; *Harris Cty. Wrecker Owners v. City of Houston* (S.D.Tex. 1996) 943 F.Supp. 711, 720-724].)

Under the FAAA Act, a state or local regulation is preempted if it is "related to" the price, route, or service of a motor carrier. The United States Supreme Court has interpreted analogous language in the Airline Deregulation Act (§ 41713(b)) to mean that a state or local law is preempted if it has "a connection with, or reference to" airline rates, routes, or services, but not if the effect is " 'too tenuous, remote, or peripheral.' " (*Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 384, 390 [112 S.Ct. 2031, 2037, 2040, 119 L.Ed.2d 157]; see *Ace, supra,* 171 F.3d at p. 773; *Californians for Safe Dump Truck Transp. v. Mendonca, supra,* 152 F.3d at pp. 1188-1189.)

---

[7]All further undesignated section references are to title 49 of the United States Code.

[8]Section 14501(c)(2)(C) provides that the preemption clause of section 14501(c)(1) "does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle."

Two federal appellate courts have considered this language in the context of towing services and have reached parallel conclusions: the general rule of preemption does apply to the towing laws in issue.[9]

The first case is *Mayer, supra,* 158 F.3d 538, where the Eleventh Circuit Court of Appeals held that Atlanta's licensing scheme for towing companies was related to the service of a towing company and was thereby preempted "because the ordinances limit who is permitted to provide the services and require that individuals and companies satisfy various criteria before they provide the services." (*Id.* at p. 545; see also *Harris Cty. Wrecker Owners v. City of Houston, supra,* 943 F.Supp. at p. 725.) The second case is *Tocher v. City of Santa Ana* (9th Cir. 2000) 219 F.3d 1040 (*Tocher*), in which the Ninth Circuit Court of Appeals recently concluded that Santa Ana's permit scheme had a direct effect on the towing market, as "the permit scheme erects barriers to entry and these barriers can affect competition for towing services in the City. [Citation.] The more applicants that are denied permits, the greater the effect on both the industry and its customers." (*Id.* at p. 1047.) Furthermore, the *Tocher* court held that the California Vehicle Code sections regulating the removal of vehicles from private property are related to a price, route, or service of a motor carrier in that the statutory provisions regulate how a company provides towing services. (*Tocher, supra,* at p. 1047.) We are persuaded by those authorities that Vehicle Code section 22658 and the San Francisco ordinances related to towing operations are sufficiently connected to the service of a towing company that those laws fall within the general rule of preemption. But that does not end the inquiry.

The FAAA Act makes an explicit exception from the general rule of preemption for laws enacted pursuant to "the safety regulatory authority of a State with respect to motor vehicles . . . ." (§ 14501(c)(2)(A).)[10] In *Tocher,* the court concluded that some sections of the California Vehicle Code at issue there escaped preemption under this "safety regulation" exception: "[Vehicle Code section] 22650 prohibits a police officer (or other unauthorized person) from removing any unattended vehicle [from a highway] without strict compliance with the Vehicle Code. [Vehicle Code section] 22658.1 requires a towing company to notify a property owner if it was necessary to cut, remove, or damage a fence in order to remove a vehicle. Each of these provisions is designed to make the towing and removal of vehicles safer by

---

[9]In a third case, the Second Circuit Court of Appeals did not reach the question as the parties agreed that section 14501(c)(1) generally preempted the New York licensing laws for towing companies. (*Ace, supra,* 171 F.3d at p. 771.)

[10]Section 14501(c)(2)(A) provides that the preemption clause of section 14501(c)(1) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles, . . . or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization."

insuring that only professionals tow vehicles and that the removal does not endanger the general public or the owner of the property where the vehicle was removed." (*Tocher, supra,* 219 F.3d at p. 1051.) However, as to other sections of the Vehicle Code in issue in *Tocher,* which included Vehicle Code section 22658, subdivisions (k) and (*l*), pertaining to acceptance of credit cards and written authorization by the property owner, the court concluded, without discussion, that those provisions were "based on consumer protection rather than safety, and the safety exception is therefore inapplicable." (*Tocher, supra,* at pp. 1044, 1052.) We conclude otherwise.

█ Preliminarily we note, as we recently confirmed, that we are not bound by a federal circuit court opinion. (*Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 355 [95 Cal.Rptr.2d 258].) In the absence of a controlling United States Supreme Court decision on a federal question, we are free to make an independent determination of law. (*Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654, 663 [65 Cal.Rptr.2d 545].) An opinion from the Ninth Circuit is no more significant than one from another circuit. (*Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 879 [271 Cal.Rptr. 513]; *Debtor Reorganizers, Inc. v. State Bd. of Equalization* (1976) 58 Cal.App.3d 691, 696 [130 Cal.Rptr. 64].) █ In the present case, we decline to follow the *Tocher* court with respect to Vehicle Code section 22658.

As noted, Vehicle Code section 22658 requires the owner of private property to notify the police before causing a vehicle to be towed and requires the towing company to obtain the written authorization of the property owner (subds. (a) & (*l*)); it also requires that the storage facility accept a credit card for payment of the towing and storage charges (subd. (k)). In our view, this statute offers far more than economic protection to the consumer. By ensuring that removal occurs only upon proper authorization, the statute obviously serves to protect vehicle owners and the public at large from both towing mistakes and outright theft of vehicles from private property. And by the requirement that the tow operator accept credit cards, the statute expedites recovery of the involuntarily towed vehicle. Thus, we disagree with *Tocher* that Vehicle Code section 22658 is merely a consumer protection statute, for several reasons.

As noted, *Tocher* reached its holding without analysis or discussion. Moreover, it reached its conclusion without mention, let alone discussion, of *Berry v. Hannigan* (1992) 7 Cal.App.4th 587, 591 [9 Cal.Rptr.2d 213], which specifically stated that subdivision (k) of Vehicle Code section 22658 " 'directly affects the safety and welfare of vehicle operators and owners.' " In *Berry,* Division One of this court addressed the issue of the constitutionality

of the law requiring tow operators to accept credit cards and, on the way to finding it constitutional, noted as follows: " 'It cannot be doubted that the unexpected loss of the use of one's vehicle directly affects the safety and welfare of vehicle operators and owners. A person may be stranded hundreds of miles from home with no alternative mode of return travel and with no place to stay until the vehicle can be recovered. . . . Legislation which tends to assist members of the public from involuntarily losing the use of their vehicles and which tends to expedite recovery of their vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public.' " (*Berry v. Hannigan, supra,* at p. 591, quoting *Crane Towing, Inc. v. Gorton* (1977) 89 Wash.2d 161, 169-170 [570 P.2d 428, 434, 97 A.L.R.3d 482].)

Finally, the conclusion in *Tocher* ignores the realities of the situation, realities well demonstrated here. To begin with, it is commonly understood that storage facilities for towed cars are unlikely to be located in densely populated, highly lighted locations, but rather in areas that might be described as desolate, especially at night when so much of the retrieval of towed cars takes place. Indeed, that was the evidence at bar: Bayshore was located in an industrial warehouse area of San Francisco.

The effect of this was demonstrated in vivid detail by the testimony of William Griffith, who described his plight—and his concern for his safety—that ensued upon his return to a private parking lot one Saturday evening to find his car missing and no one in the parking lot. Griffith called the number on the sign, but was told that there was no record of his car being towed. After believing for a while that his car had been stolen, Griffith called again and was told that his car had been towed and to call Bayshore. He did and was advised to go to the Bayshore storage lot. He did that, traveling by taxi cab, after spending 45 minutes trying to hail one. Griffith took the taxi to the "tow yard" and, concerned about its location, asked the taxi driver to wait with him while he retrieved his car. Griffith went to the gate, and the person there said he could not let him in and that he had to wait. After some 20 minutes, Griffith "ran out of money" to continue to pay the taxi driver, so he asked the driver take him to a McDonald's, where he used a pay telephone to again call Bayshore. Griffith asked "where they were," and the person responded they were "on their way." Griffith had the taxi driver return him to the tow yard, where he was let off to wait alone, as he had no more money to pay the driver. Griffith waited for another 45 minutes to an hour until Servantes finally arrived. Griffith got out his credit card, to be expressly told that his credit card "won't be accepted and [that] only $140 cash would be accepted." Servantes then drove Griffith to an ATM (automated teller

machine) where, as he put it, he was "just fortunate that [he] had enough money in the bank to cover it." Griffith withdrew the money, and they returned to the tow yard where he recovered his car.

In sum and in short, we find a public safety purpose in the protections Vehicle Code section 22658 offers to the owner of a vehicle.

That brings us to a discussion of the San Francisco regulations and whether the safety regulation exception applies to them. With respect to municipal ordinances, as distinct from state statutes, the existing case law is divided. On the one hand, the Eleventh Circuit held that the safety regulation exception did not apply to Atlanta's municipal ordinances because the exception authorizes only a "State" to enact safety regulations, not a municipality or other political subdivision of a state. (*Mayer, supra,* 158 F.3d at pp. 545-548.) The court pointed out that section 14501(c)(2)(A) is the only subsection of the FAAA Act that mentions the authority of a state without also mentioning the state's political subdivisions. Further, the court reasoned that the preemption of municipal ordinances is consistent with Congress's deregulatory purpose: "By withholding the authority to enact safety and insurance regulations from political subdivisions, Congress ensured that counties and municipalities would not enact differing (and perhaps inconsistent) sets of safety and insurance ordinances. Stated differently, it is reasonable to assume that Congress decided that safety and insurance ordinances must be enacted on a statewide level, in order to minimize the disturbances to the motor transportation industry that a patchwork of local ordinances inevitably would create." (*Mayer, supra,* at pp. 545-546.)

A contrary result was reached by the Second Circuit in *Ace, supra,* 171 F.3d at pages 775-776, which declined to follow *Mayer.* The *Ace* court first concluded that the omission within the safety regulation exception of any mention of political subdivisions did not prevent a state from delegating its regulatory authority to a municipality. Further, the court reasoned that Congress's intent was to eliminate local economic regulation, not local safety regulation. Consequently, the *Ace* court held that New York City's requirements regarding licensing, recordkeeping, and other operations of towing businesses were directly related to safety concerns, with only an incidental economic burden, and thereby fell within the exception of section 14501(c)(2)(A). (See also *Hott v. City of San Jose, supra,* 92 F.Supp.2d 996; *Harris Cty. Wrecker Owners v. City of Houston, supra,* 943 F.Supp. at pp. 725-732.)

Most recently, the Ninth Circuit followed *Mayer* and held that the Santa Ana ordinances governing the operations of towing businesses were preempted and did not fall within the safety regulation exception, because that

exception "only exempts safety regulations promulgated by state governments, not those enacted by municipalities." (*Tocher, supra,* 219 F.3d at p. 1050.) Interpreting the language of the FAAA Act in light of its purpose, the court held that Congress deliberately omitted *municipal* safety regulations from the exception. "Allowing both states and municipalities to escape preemption under the guise of regulating safety could lead to widespread, diverse regulation of motor carriers, precisely what Congress sought to avoid in promulgating a broad preemption statute." (*Id.* at p. 1051.) Further, the court held that for preemption purposes a state may not delegate its regulatory authority to a municipality; otherwise, "Congress would always be required to preempt both state and local laws, or preempt neither. That result would violate fundamental principles of federalism and lead to a distorted interpretation of the Supremacy Clause." (*Ibid.*)

We find the Second Circuit's opinion in *Ace* more persuasive and follow its reasoning here. When, as here, a federal statute expressly preempts state or local law, the determination of the scope of the preemption must " 'start with the assumption that the historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress.' [Citations.]" (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700]; see also *Southern Cal. Gas Co. v. Occupational Safety & Health Appeals Bd., supra,* 58 Cal.App.4th at p. 204.) Because safety regulations fall within the traditional police powers of the states, and because Congress has expressly excepted safety regulations from the preemption clause, we cannot curtail the ability of local municipalities to respond to local safety concerns without a clear expression that such was the intent of Congress. (*Southern Cal. Gas Co. v. Occupational Safety & Health Appeals Bd., supra,* at p. 205.)

At best, the legislative history shows that Congress's deregulatory purpose was focused on disparate *economic* regulation: "[P]reemption legislation is in the public interest as well as necessary to facilitate interstate commerce. *State economic regulation* of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. . . . The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business." (H.R. Rep. No. 103-677, 2d. Sess. (1994), reprinted in 1994 U.S. Code Cong. & Admin. News, pp. 1715, 1758-1759, italics added.) In fact, the House Conference Report indicated that "State authority to regulate safety,

financial fitness and insurance . . . of motor carriers is unchanged[,] since State regulation in those areas is not a price, route or service and thus is unaffected." (*Id.* at p. 1757.) We find in the legislative history no expression of a congressional desire to preempt local control over safety issues.

Moreover, we take issue with the Ninth Circuit's conclusion in *Tocher* that under section 14501(c)(2)(A) a state's authority to delegate safety regulations to municipalities must be ignored. The Ninth Circuit reasoned: "If this Court were to hold that a state can always delegate its responsibility to municipalities, Congress would always be required to preempt both state and local laws, or preempt neither. That result would violate fundamental principles of federalism and lead to a distorted interpretation of the Supremacy Clause." (*Tocher, supra,* 219 F.3d at p. 1051.)

In our view, the *Tocher* concern is overstated. In the FAAA Act Congress did expressly preempt, as a general rule, any law or regulation by a state or political subdivision of a state. (§ 14501(c)(1).) However, Congress made an express exception for the state's safety regulatory authority. Had Congress intended not to except municipal safety regulations, Congress could have said so. We can discern no violation of principles of federalism in a construction of section 14501(c)(2)(A) that allows a state to delegate its authority to a municipality. (See *Wisconsin Public Intervenor v. Mortier* (1991) 501 U.S. 597, 607-609, 611-612 [111 S.Ct. 2476, 2482-2484, 2485-2486, 115 L.Ed.2d 532] [act permitting "States" to regulate pesticides authorized states to allow local regulation of pesticides].)

In summary, we conclude that when, as here, the state has delegated authority to local authorities (Veh. Code, § 21100, subd. (g)), the municipal regulations on safety issues fall within the exception of the FAAA Act (§ 14501(c)(2)(A)) and are not preempted.

We further conclude that in the present case, as in *Ace,* the San Francisco ordinances establishing licensing, reporting, recordkeeping, and other requirements for towing businesses are directly related to safety concerns and fall within the safety regulation exception. The permit scheme of the San Francisco Police Code serves to ensure that only qualified persons undertake nonconsensual tows. The permit application process allows the police to check the background of permit applicants and to reject unsuitable persons, e.g., those with a history of vehicle offenses. (S.F. Police Code, § 3004.) Moreover, tow truck drivers must submit a letter of hire from a licensed towing company, thereby ensuring that the company will be accountable for the driver. (S.F. Police Code, § 3003, subd. (d).)

As we explained in connection with Vehicle Code section 22658, the reporting and recordkeeping requirements of the San Francisco ordinances help ensure that vehicles will be towed only for proper purposes. And the San Francisco Police Code's requirement of prompt notice to the police tow desk further serves to avoid burdening the police with mistaken reports of stolen vehicles. (S.F. Police Code, §§ 3057, 3060.)

In any event, even if we were to conclude otherwise and find the San Francisco ordinances preempted by the FAAA Act, we would have no hesitation in affirming the trial court's judgment here. The trial court principally based its judgment upon Servantes's violations of state law, specifically Vehicle Code section 22658. Although the court additionally found that Servantes had violated the permit requirements of the San Francisco Police Code, the court imposed no additional penalties on account of these particular violations.

■ Furthermore, California's unfair competition law prohibits not only unlawful business practices but also unfair business practices. (Bus. & Prof. Code, § 17200 et seq.) The statute is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180-181 [83 Cal.Rptr.2d 548, 973 P.2d 527]; *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89].) Servantes is simply incorrect in his assertion that California's Unfair Competition Act prohibits only conduct that is unfair to competitors. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109-113 [101 Cal.Rptr. 745, 496 P.2d 817].) One test for determining an "unfair" practice is that the gravity of the harm to the victim outweighs the utility of the defendant's conduct. (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1103-1104 [53 Cal.Rptr.2d 229]; *Podolsky v. First Healthcare Corp., supra,* at p. 647; *People v. Duz-Mor Diagnostic Laboratory, Inc., supra,* 68 Cal.App.4th at p. 662; but see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* at pp. 184-185 [test held too vague for injuries to competitors].) ■ Here, the injuries inflicted upon the unwitting victims were substantial, while the conduct of Servantes was entirely unethical and unscrupulous with no redeeming value. (See *People v. James* (1981) 122 Cal.App.3d 25, 35-36 [177 Cal.Rptr. 110].)

We find no error in the trial court's conclusion that the conduct of Servantes constituted unlawful business practices in violation of Business and Professions Code section 17200 et seq.

IV.-VI.*

. . . . . . . . . . . . . . . . . . . . . . .

## VII. DISPOSITION

The judgment is affirmed.

Jones, P. J., and Stevens, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 16, 2001.

---

*See footnote 1, *ante*, page 1081.