**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 9, 2006**

Charles R. Fulbruge III
Clerk

**REVISED AUGUST 10, 2006**
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 05-10116

VRC LLC,

Plaintiff-Appellant

VERSUS

CITY OF DALLAS; DON BEARDEN; MARCUS CURRIE; DOES 1-30,

Defendants

CITY OF DALLAS,

Defendant-Appellee

Appeal from the United States District Court
For the Northern District of Texas
(3:03-CV-2450-B)

Before KING, BARKSDALE, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The plaintiff-appellant, VRC LLC, provides non-

consent towing services from private property in Dallas, Texas. VRC sued the City of Dallas for declaratory relief and a permanent injunction preventing enforcement of a city ordinance regulating such activities. The challenged ordinance, Dallas City Code Chapter 48A, section 48A-36, requires that signs warning of the threat of towing be posted on private property when, and for twenty-four hours before, a vehicle is towed without the vehicle owner's consent.[1] The ordinance contains specific requirements regarding the content and placement of the signs.[2] The ordinance is penal in nature and is punishable by a fine of $200-$500 subject to doubling or trebling for subsequent offenses. DALLAS, TEX. CITY CODE Ch.

---

[1] REQUIREMENTS FOR POSTING SIGNS

(a) A person commits an offense if he removes or causes the removal of a vehicle from private property without signs being posted and maintained on the private property in accordance with this section at the time of towing and for at least 24 hours prior to the removal of the vehicle.

DALLAS, TEX. CITY CODE Ch. 48A § 48A-36.

[2] The regulation includes requirements about the placement, size, color, language, and lettering of the sign.

48A § 48A-50.  The City stipulated that the ordinance was enforced against VRC.

VRC argues that § 48A-36 is preempted by federal law, the Interstate Commerce Commission Termination Act of 1995, specifically 49 U.S.C. § 14501(c).  VRC further argues that the ordinance is not exempted from preemption by subsection (c)(2)(A) of that statute.  The statute's relevant general preemption rule, 49 U.S.C. § 14501(c), says:

> (c) Motor carriers of property.--
>
> (1)  General  rule.–  Except  as  provided  in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor  private  carrier,  broker,  or  freight forwarder with respect to the transportation of property.

The parties agreed in the trial court that the city ordinance is preempted by this general rule, as applied without  the  safety  regulation  exception  found  in subsection (c)(2)(A).  On appeal, however, the City seeks to  raise  an  issue  about  whether  the  city  ordinance

3

relates to a "service of any motor carrier," such that the general preemption rule applies. Of course, the parties continue to dispute whether the safety regulation exception in subsection (c)(2)(A) applies to exempt the ordinance from preemption under the general rule.

The safety regulation exception in subsection (c)(2)(A) says:

> (2) Matters not covered.– Paragraph (1) . . .
>
> (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle, or the authority of a State to regulate carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c). The City argues that the ordinance is a safety regulation because it prevents violent confrontations between the owners of cars being towed from private property and tow truck drivers and because it cuts down on the number of false reports of stolen cars, which waste police resources that could be better spent protecting public safety. VRC argues that the regulation is merely an economic regulation dressed up as

4

a safety regulation to avoid federal preemption by section 14501.

The preamble to the city ordinance recites a safety purpose. Specifically, it provides:

> WHEREAS, the city council finds that the proposed regulations governing persons performing nonconsensual tows from private property, which regulations include, but are not limited to, licensing, signage, reporting, inspection, vehicle equipment, insurance, and rate requirements, are all safety-related or otherwise fall within the 49 U.S.C. § 14501(c) exception; and
>
> WHEREAS, the city council believes that the proposed safety-related regulations for non-consensual tows would promote the public safety of both visitors and residents of the city of Dallas by contributing to a decrease in the potential for confrontation and violence between vehicle owners and the persons who tow their vehicles; a decrease in bodily injury and property damage caused by faulty tow truck vehicles and equipment or by incompetent, negligent, and criminal actions of tow truck operators and drivers; a decrease in the number of false auto theft reports processed by the police department, thereby allowing the police to devote more time to responding to more critical public safety situations; and a decrease in auto theft incidences and an increase in the recovery of stolen autos by allowing the police to more quickly and efficiently determine when a car has been stolen, rather than towed, and take appropriate action; . . . .

DALLAS, TEX. ORDINANCE 24175 (Jan. 20, 2000) (preamble).

At a trial on the merits, Mr. Don Bearden, the Interim Administrator of Transportation Regulation, testified about his experiences as the City's administrator of the ordinance. He testified that he "ha[d] seen some of the aftermath" of confrontations between vehicle owners and tow truck drivers. He also testified that on one occasion while visiting one of the towing companies he overheard the drivers talking about bullet holes in their trucks from where the trucks had been shot and saw the bullet holes. He also testified that he was aware of other similar concerns about altercations between tow truck drivers and the public and that sometimes his offices received complaints from vehicle owners as a tow was ongoing, i.e., while the tow truck was present and preparing to tow the person's car. Mr. Bearden could not, however, produce any documentary evidence, reports, or studies of the phenomenon of vehicle owner/tow truck driver altercations. Counsel for VRC asked Mr. Bearden a series of questions about whether, given the premise that car owners are likely to become irate about their vehicles being towed, the

6

presence of the signs can help defuse the situation. In essence, Mr. Bearden, who helped draft the ordinance, testified that he believed the signs did help reduce the likelihood of violent altercations. He testified in response to a question from VRC's attorney:

> Citizens have called in and they can be very irate and didn't know why their car was towed or anything. They are basically ready to go out and do physical bodily damage to somebody. We can point out that the signs are supposed to be posted, it would tell them who has got the car. And once we got through the process of telling them what to look for, where to find the information on where the car is, they have calmed down quite a bit.

Mr. Bearden also testified that the signs helped tow truck drivers defuse situations by concretely justifying the towing company's actions as being under contract with the property owner. Further, Mr. Bearden testified that in his opinion the signs helped inform the public that their cars had been towed, not stolen, thereby reducing the number of false stolen car reports, and thus the police department's workload in responding to such reports.

Larry White, the manager of VRC, testified that his company, which has contracts with over 6,000 properties

in Dallas, incurs an average cost of $11,500 per month for placing and maintaining the signs as required by Section 48A-36. This makes the monthly average cost about $1.92 per property. The company would likely incur at least some of these costs regardless of the statute because, as Mr. White also testified, it would be in VRC's best interests to post signs warning that unauthorized vehicles would be towed, and informing hapless vehicle owners where to retrieve their cars.

The district court found that § 48A-36 was sufficiently safety-related and filed findings of fact and conclusions of law in favor of the City of Dallas. VRC timely appealed.

## Standard of Review

Generally, the denial of a permanent injunction is reviewed for abuse of discretion. *North Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916 (5th Cir. 1996); *Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 396 (5th Cir. 2000). In an express preemption case, however, the court reviews a district court's preemption determinations de novo.

*White Buffalo Ventures, LLC v. Univ. of Texas at Austin*, 420 F.3d 366, 370 (5th Cir. 2005); *Baker v. Farmers Elec. Coop., Inc.*, 34 F.3d 274, 278 (5th Cir. 1994) ("Preemption is a question of law reviewed *de novo*."). Therefore, the ultimate issue in this case is reviewed de novo.

## Discussion

The party seeking a permanent injunction must meet a four-part test. It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Dresser-Rand, Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847-48 (5th Cir. 2004) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)). In an express preemption case, however, "the finding with respect to likelihood of success carries with it a determination that the other three requirements have been satisfied." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 783 (5th Cir.

9

1990); *see also Greyhound Lines, Inc. v. City of New Orleans*, 29 F. Supp. 2d 339, 341 (E.D. La. 1998).

An analysis of any claim that federal law preempts state law starts with the "presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). Whether federal law expressly preempts a state law is at bottom a question of statutory intent. *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992).

The first issue to be addressed is whether the City of Dallas may argue for the first time on appeal that the general rule found in 49 U.S.C. § 14501(c) does not apply to the ordinance at issue because it does not relate to VRC's towing services. The City concedes in its brief that "the focus in the trial court was on whether Section 48A-36 falls under the safety exception in Paragraph (2)(a)." It argues, however, that notwithstanding this "focus," VRC must still first meet its burden of persuasion that the sign ordinance is "related to" VRC's services. The City points out that the burden of

10

persuasion in preemption cases lies with the party seeking to nullify the state statute. *AT&T Corp. v. Pub. Util. Comm'n*, 373 F.3d 641, 645 (5th Cir. 2004). VRC replies that arguments made for the first time on appeal, and therefore not raised in the district court, are waived. *See Charter School of Pine Grove, Inc. v. St. Helena Parish Sch. Bd.*, 417 F.3d 444, 447 (5th Cir. 2005) ("Ordinarily, arguments not raised in the district court cannot be asserted for the first time on appeal."); *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000). Nothing in the amended pretrial order indicated that this issue was in dispute in the trial court, and the district court's findings of fact specifically state that "[t]he parties have not disputed that tow trucks are motor carriers or the Dallas City Code Chapter 48A Section 36 relates to the services provided by motor carriers. Therefore, the Ordinance is preempted by 49 U.S.C. § 14501 unless it falls within the safety-related exception." Given the City's failure to bring this issue up before the trial court, we find that the City has waived this argument.

The second, and major, issue is whether the safety exception in 49 U.S.C. § 14501(c)(2)(A) applies to exempt the ordinance from federal preemption. The City begins its argument around a fairly recent Supreme Court case, *Ours Garage*, which held that States can delegate their safety regulatory authority with respect to motor vehicles to their cities or other political subdivisions. *City of Columbus v. Ours Garage & Wrecker Serv.*, 536 U.S. 424, 428 (2002). In *Ours Garage*, the Court considered a different aspect of 49 U.S.C. § 14501(c), but began by stating that "[p]reemption analysis 'starts with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*. at 438 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The Court went on to opine on the congressional purpose for the safety exception, saying, "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over

12

safety." *Id*. at 439.[3]  The Court also warned that states and municipalities could not hide economic regulation under the guise of safety regulation.  The Court said, "Local regulation of prices, routes, or services of tow trucks that is not genuinely responsive to safety concerns garners no exemption from § 14501(c)(1)'s preemption rule." *Id*. at 442.  After determining that the state could validly delegate its regulatory authority, the Supreme Court remanded for determination of whether the ordinances at issue in *Ours Garage* fell within the safety exception.  *Id*.  The Supreme Court expressly declined to define the parameters of the exception.  *Cole v. City of Dallas*, 314 F.3d 730, 732 (5th Cir. 2002) (citing *Ours Garage*, 536 U.S. at 442).

Case law both predating and applying the principles discussed in *Ours Garage* has on the whole given a broad construction to the safety regulation exception.  Even the appellant, VRC, implicitly concedes this by essentially arguing for a change in the law.  Its

---

[3] The Court supported this opinion with legislative history not cited here.

'Summary of the Argument' states that "[m]ore recently, courts have allowed regulations to escape preemption because the regulations included a recitation that their purpose is safety." VRC argues for an essentially new, 'workable' standard wherein the court inquires closely into the legitimacy of the municipality's safety concern and ensures that it is not a guise for economic regulation. Such a standard would include a requirement that there be a close nexus between the safety concern and the regulation.[4]

Following *Ours Garage*, this court, in *Cole,* upheld a city ordinance prohibiting persons convicted of a felony under the Texas Controlled Substances Act, or a comparable law, within the preceding five years from

---

[4] VRC's example case is a district court case which was overturned on appeal, but some conclusions of which ultimately were vindicated. *See Harris County Wrecker Owners for Equal Opportunity v. City of Houston*, 943 F. Supp. 711 (S.D. Tex. 1996). VRC admires this opinion for the depth with which the district court reviewed the issues. Unfortunately for VRC, that case has been abrogated. *See Stucky v. City of San Antonio*, 260 F.3d 424 (5th Cir. 2001), *vacated*, 536 U.S. 936 (2002) (remanding for further consideration in light of *Ours Garage*.) And, as VRC acknowledges, most of the courts that have addressed the safety exception since then have done so in a relatively "cursory" manner.

obtaining a wrecker driver's permit. 314 F.3d at 734-35. The *Cole* court described Congress' purpose when enacting 49 U.S.C. § 14501(c) as the "slender congressional goal of addressing *economic* authority over such carriers" and "decline[d] to elasticize Congress's economic goal by narrowly interpreting safety regulatory authority of a State with respect to motor vehicles." *Id.* at 733-734 (internal quotation marks omitted). The court specifically considered the preamble to the ordinance and did not note that the city had entered any studies or expert testimony about the dangers of drug users or felons with wrecker's licences into evidence. The court merely stated that "[i]t is difficult to imagine a regulation with a more direct protective nexus or peripheral economic burden." *Id.* at 735.

The Eleventh Circuit has also recently confronted a nonconsensual towing ordinance, in Miami Beach, which required towing permits, business applications, written authorization for towing, and storage within the city limits. *Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1252 (11th Cir. 2003). The Eleventh

15

Circuit also specifically considered the evidence of legislative intent present in the city's ordinance and the testimony of city officials about how the relevant parts of the ordinance related to the city's safety concerns. The court upheld the ordinance.

Several other courts have also upheld similar ordinances against preemption challenges, finding that the state's or municipality's requirements fell within the safety regulation exception. *See Tillison v. City of San Diego*, 406 F.3d 1126, 1127 (9th Cir. 2005) (upholding requirements of written authorization from the real property owner or lessee and presence of that owner/lessee or a representative at the time of the tow); *Tow Operators Working to Protect Their Right to Operate v. City of Kansas City*, 338 F.3d 873, 876 (8th Cir. 2003) (upholding a rotation requirement and a solicitation ban); *Hott v. City of San Jose*, 92 F. Supp. 2d 996, 999–1000 (N.D. Cal. 2000) (upholding a requirement of liability insurance, a criminal background check, display of certain information, reporting, and record keeping); *Capitol City Towing & Recovery, Inc. v. Louisiana*, 873

16

So. 2d 706, 711-13 (La. Ct. App. 2004) (upholding a solicitation ban, drivers' uniform requirement, storage facility requirements, and an oil-absorbent materials requirement).

In a persuasive opinion, a California appellate court has also upheld laws establishing licensing, reporting, record keeping, credit card acceptance, and other requirements. *California ex rel. Renne v. Servantes*, 103 Cal. Rptr. 2d 870, 880-81 (Cal. Ct. App. 2001), *cert. denied*, 536 U.S. 939 (2002). The *Servantes* court cited several previous cases in declaring that the unexpected loss of the use of a vehicle directly affected the safety of its operators. *Id*. at 878 (citing *Berry v. Hannigan*, 9 Cal. Rptr. 2d 213, 215 (Cal. Ct. App. 1992), and *Crane Towing, Inc. v. Gorton*, 570 P.2d 428 (Wash. 1977)). The court reasoned that the operator of a towed vehicle could be left stranded and that legislation which assisted members of the public in avoiding the loss of their vehicles and reclaiming such vehicles once towed "fairly and clearly promotes the safety and welfare of the public." *Id*.

The ruling most favorable to VRC's position was recently issued by the Second Circuit in light of the *Ours Garage* decision. *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136 (2d Cir. 2006). It is, however, readily distinguishable. *Loyal Tire* refines the Second Circuit's previous standard in safety exception cases, which was established in *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765 (2d Cir. 1999). *Ace* held that the regulations must be "reasonably related to the safety aspects of towing disabled vehicles and that the economic burdens thereby imposed are only incidental." *Id.* at 777.[5] The *Loyal Tire* court modified that rule in light of *Ours Garage*, and the facts before it, to require in addition that a regulation be

_____

[5] The regulations challenged in *Ace*, which dealt with the practice of "wreck chasing," ranged from licensing and record keeping to the maintenance of storage and repair facilities, but the Second Circuit did not engage in a detailed analysis. In fact, the court said that "[m]ost of these requirements are so directly related to safety or financial responsibility and impose so peripheral and incidental an economic burden that no detailed analysis is necessary to conclude that they fall within the § 14501(c)(2)(A) exemptions." *Id.* at 776.

18

"genuinely responsive" to safety concerns. *Loyal Tire*, 445 F.3d at 145. The opinion holds that in making a determination about whether a regulation is "genuinely responsive" to safety concerns, the court must "consider any specific expressions of legislative intent in the statute itself as well as the legislative history, and . . . must assess any purported safety justifications asserted by the state or municipality in light of the existing record evidence." *Id*. In *Loyal Tire*, there was significant record evidence and legislative history indicating that the challenged ordinance had been passed by the Town of Woodbury in order to discriminate against out of town towing companies, particularly Loyal Tire. *Id*. at 139-41, 146-47.[6] There is no evidence of such a discriminatory motive in the case at bar. Moreover, all of the safety concerns purportedly addressed by the

---

[6] Prior to passage of the ordinance, Loyal Tire had been involved in a dispute with a town board member's family, and the police chief, over services rendered. *Id*. at 140. In addition, the minutes of town meeting discussions about passage of the ordinance were "replete" with complaints about the service provided by Loyal Tire and other out of town companies, but contained no discussion of safety concerns. *Id*. at 146.

statute challenged in *Loyal Tire* were documented only after litigation commenced. *See id*. at 141, 148. The ordinance itself contained only a general statement that towing regulations as a whole are in the interest of public safety. *Id*. at 146 In contrast, the Dallas ordinance challenged here contains a contemporaneous and detailed declaration that the ordinance is responsive to safety concerns. DALLAS, TEX. ORDINANCE 24175 (Jan. 20, 2000) (preamble).

VRC also cites two cases with slightly narrower interpretations of the safety regulation exception, but both were decided before *Ours Garage* and *Cole*. *See Northway Towing, Inc. v. City of Pasadena*, 94 F. Supp. 2d 801, 803 (S.D. Tex 2000), *abrogated by Stuckey v. City of San Antonio*, 260 F.3d 424, 443 (5th Cir. 2001); *Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 306 (Tex. App.-Dallas 2001, pet. denied). In fact, in light of *Ours Garage*, the Texas Court of Appeals in Dallas appears to have withdrawn from its position in *Whitten*. *See A.J.'s Wrecker Serv. of Dallas, Inc. v. Salazar*, 165 S.W.3d 444, 450 (Tex. App.-Dallas 2005) ("In light of the

Supreme Court's holding in *Ours Garage*, we conclude this Court's narrow reading of the safety exception in *Whitten* is not controlling.").

On this issue, the weight of the case law supports the City's broader interpretation of the safety exception in the context of 49 U.S.C. § 14501(c). In addition, the general rule that federal preemption is to be found only where congressional intent is clear, particularly where the traditional police power is at issue, also falls on the City's side.[7] Beyond these basic legal rules, the evidence shows that the Dallas City Council considered the possibility of violent confrontation between unwarned vehicle owners and tow truck drivers a safety issue and found that a requirement that signs be placed and maintained would help remedy the problem. Further, a city administrator testified from his experience that

---

[7] We recognize the wisdom, however, of the admonition in *New Hampshire Motor Transport Ass'n v. Rowe*, 448 F.3d 66, 76 (1st Cir. 2006), a Federal Aviation Administration Authorization Act of 1994 case, that an exclusion from preemption for all police-power enactments "would surely 'swallow the rule of preemption,' as most state laws are enacted pursuant to this authority."

there was a real problem with confrontation between citizens and tow truck drivers and that the signs had been helpful. Logically, the signs could prevent drivers from parking where they were at risk of being towed, help to defuse the anger of some who actually were towed, and as the city administrator testified and the ordinance preamble noted, reduce the drain on police resources caused by false stolen car reports. Also, while it was not a focus of the City's argument, the California court that decided *Servantes* had a point about the danger to stranded motorists. The nexus between this ordinance and public safety seems far less attenuated than many of the ordinances upheld in the cases cited above, particularly cases involving record keeping, reporting, liability insurance, written authorization, and the presence of property owners. Further, the economic burden on VRC is apparently fairly minimal; testimony showed an average compliance cost of $1.92 per property. And, as the City points out, VRC could require that the property owners it contracts with maintain the signs. $1.92 per property is certainly less burdensome than regulations upheld in

cases discussed above, for example, maintaining storage facilities in Miami Beach.

We recognize that VRC may have a point that municipalities are accomplishing some economic regulation, or more precisely consumer protection, while making findings about safety in the preambles of their ordinances. We note, however, that safety and consumer protection are not mutually exclusive categories. And, more importantly, we reiterate that in this case the City's safety concerns are real enough that the court is convinced that they are both reasonably related and genuinely responsive to safety concerns. Accordingly, we need not inquire further.[8]

We conclude that the City ordinance is not preempted by federal law and, therefore, VRC has not met the requirements for a permanent injunction. The judgment of the district court is AFFIRMED.

---

[8] VRC did not make any showing about what illicit economic regulation was hidden in this safety-related regulation. This court recognized a similar failing in *Cole*. 314 F.3d at 735.